UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ARTHUR and GAIL COWARD

                              Plaintiffs,

      v.                                        3:05-CV-285

MICHAEL GILROY, Individually and in his Official
Capacity as Family Care Coordinator for the New
York State Office of Mental Retardation and
Development Disabilities, et. al.

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiffs Arthur and Gail Coward commenced the instant action pursuant to 42 U.S.C. § 1983 arising out of the revocation of their operating certificate to provide assisted living for mentally retarded adults. Presently before the Court is Defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of Plaintiffs' Complaint.

**I.    FACTS**

The Cowards were family care home operators who participated in the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") program to provide assisted living for mentally disabled adults. In the summer of 2004, three mentally disabled adults, known as "consumers," resided with the Cowards.

In August 2004, Gail Coward and Defendant Deborah Curry, an OMRDD nurse, differed over what treatment one of the consumers, PV, should receive for breast cancer. At

a consultation, PV's doctor explained the pros and cons of a mastectomy versus a lumpectomy. Curry advocated for a mastectomy while Gail Coward believed that a lumpectomy was the best course of action. PV's father was informed of the doctor's recommendation and a second consultation was arranged. This second consultation was with a doctor in the same office as the first. The Cowards voiced their concerns over obtaining a consultation with a doctor in the same office as the first. As a result, an appointment was arranged with a doctor in a different office. At the second consultation on August 30, 2004, Gail Coward asserted that "no ones [sic] going to hack and slash her [PV] because she's mentally retarded." Pl Ex. B, Casey's Notes, at 6. After this consultation, Karen Casey, PV's OMRDD case worker, visited the Cowards at their home regarding PV's upcoming surgery. Gail Coward again voiced her concern about a mastectomy.

PV's father decided that PV should have a lumpectomy. Caseworker Casey's notes and Nurse Curry's deposition testimony indicate that PV's father's decision was made on the Cowards' recommendation. Pl. Ex. W, Curry Testimony, at 78. The surgery was originally scheduled for September 7, 2004, but rescheduled for September 21, 2004. Caseworker Casey's notes for September 3, 2004 indicate the date change occurred because September 6, 2004 was a holiday and pre-operation work was necessary the day before the surgery. Pl. Ex. B, Casey Notes, at 9. The Cowards contest this entry and believe that it was inserted after September 9, 2007.

On September 21, 2004, PV underwent a lumpectomy. During the lumpectomy, PV's doctors concluded that a mastectomy was required due to the spread of PV's cancer. The doctors, therefore, performed a mastectomy.

On September 7, 2004, one of the Coward's other consumers, KC, called 911 from the Broome-Tioga Association for Retarded Citizens ("ARC") Center. During this 911 telephone call, KC complained that Gail Coward had subjected him to psychological abuse. Quain Decl., at ¶ 4. These statements included "I've been threatened..."; "They cursing me and threatening me last night;" and "She [Gail Coward] said, she don't want to take care of my black ass, cause I'm black and I'm this and that and the other and she threatened me." Def. Ex. A, Quain Decl., Transcript of KC's 911 call, at 1. The ARC staff reported this call to Nurse Curry. Nurse Curry informed her supervisor, Defendant Joseph Mahon. The Cowards contend that Curry or the ARC should have contacted them first about the call. According to KC's psychiatrist, KC suffers from schizoaffective disorder and mental retardation and that his statements and actions are not always based on reality. See Pl. Ex. A, Papastrat Aff., at ¶ 32-35.

Shortly after the call, Defendant Patricia McDonnell, Director of the Broome Developmental Disabilities Service Office ("Broome DDSO"), started an investigation into whether to revoke the Cowards's operating certificate. McDonnell temporarily suspended their license until the end of the investigation. McDonnell Decl., ¶ 8. Defendant Teresa Quain carried out the investigation on behalf of OMRDD. The three consumers in the Cowards' home were temporarily removed while the investigation was carried out. McDonnell Decl., ¶ 13.

In an October 6, 2004 administrative hearing, the Cowards challenged the temporary removal action of the OMRDD. An independent hearing officer found the temporary license suspension proper. Id. at ¶ 14.

Thereafter, McDonnell commenced proceedings to revoke Plaintiffs' license. The stated basis for the revocation was (1) KC's 911 call; (2) corroboration of the allegations by another consumer; (3) Arthur Coward giving a psychotropic medication to a consumer without first notifying Broome DDSO personnel as required; (4) PV's father's corroboration of an allegation of physical abuse by the Cowards' daughter and failure of the Cowards to report the incident; and (5) the Cowards' refusal to interview a second time with the investigator in violation of their obligation under 14 NYCRR § 687.8(c). McDonnell Decl., at ¶ 15; see also Quain Decl., Def. Ex. C.

On November 4, 2004, OMRDD notified the Cowards and their counsel of OMRDD's intent to revoke the operating license. Plaintiffs were advised that they had 30 days to request a hearing to oppose this decision. The Cowards did not timely request a hearing. On December 15, 2004, McDonnell issued a decision revoking the Cowards's operating certificate.

Plaintiffs then filed this action pursuant to 42 U.S.C. §1983 asserting that OMRDD's investigation was pursued in retaliation for the exercise of their First Amendment rights concerning PV's medical treatment. Second Amend. Compl., ¶ 63.[1] Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the complaint.

## II.   STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedures governs motions for summary judgment. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v.

---

[1] Plaintiffs also asserted due process claims which were dismissed by decision and order dated August 24, 2005, familiarity with which is presumed.

Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. V. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). With this standard in mind, the Court will address Defendants' motion.

### III.  DISCUSSION

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) "that some person has deprived him of a federal right" and (2) "that the person who has deprived him of that right acted under color of state … law." Gomez v. Toledo, 446 U.S. 635, 640 (1980) (citing Monroe v. Pape, 365 U.S. 167, 171 (1961)); see also Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993). Defendants do not dispute that they are state actors

for purposes of this suit.  Defendants claim that plaintiffs' speech is not constitutionally protected and that, even if it is, there is no causal relationship between this speech and the actions taken against Plaintiffs' license.  Defendants McDonnell, Sudano, and Zibell also claim that they are entitled to absolute immunity.[2]  All other defendants claim qualified immunity.

Under certain circumstances, speech by public employees or government contractors receives less constitutional protection than that made by private citizens.  See Garcetti v. Ceballos, 126 S.Ct 1951, 1957-58 (2006); see also Board of County Comm'rs v. Umbehr, 518 U.S. 668, 677-79 (1996) (applying the "existing framework for government employee cases to independent contractors" for the purpose of analyzing First Amendment retaliation claims).  Therefore, the first issue here is whether the Cowards may be considered to be public employees or government contractors.

The Cowards were licensed operators of an adult home for mentally retarded adults governed by the OMRDD.  Second Amend. Compl. ¶ 18; see also 14 N.Y.C.R.R. § 687.4 (2006) (providing requirements for certification of family care home).  Under this license, OMRDD has the right to investigate and monitor the Cowards' home to protect consumers and enhance the quality of care in these facilities.  See 14 N.Y. MENT HYG. § 13.07; 14 N.Y.C.R.R. §§ 624.2, 687.7 (2006).  As licensed operators, New York State imposed "duties and responsibilities" including providing for the "medical and health needs of residents."  14 N.Y.C.R.R. § 87.8; see also 14 N.Y.C.R.R. §§ 687.2, 687.8.  The OMRDD places the "consumers" into the residential homes of the licensed operators.  Def. and Pl. Statement of

---

[2]Sidano and Zibell are government employees who acted as OMRDD's attorneys during the administrative proceedings against the Cowards.

Material Fact, ¶ 3.  Accordingly, Plaintiffs as operators of these homes, receive compensation from OMRDD.  See Amend. Compl. ¶ 30; see also 14 N.Y.C.R.R. § 87.12.  Further, the Cowards contend they "suffered an adverse employment action" as a result of their speech.  Pl. Mem. Opp. Summary Judg., at p. 29.  They also state that "the primary source of the income were the proceeds they received from caring for the consumers who resided in their home."  Amend. Compl., ¶ 30 (Dkt. No. 40).  Their position as licensed operators of an adult home may be analogized to that of public employees or independent contractors of the government.  See Umbehr, 518 U.S. at 677-79; see also Claim of Curran, 145 A.D.2d 759, 759-60 (3rd Dept. 1988)("[F]amily care provider[s] . . . enter[ ] into a contract with OMRDD."); Harris v. State, 117 A.D.2d 298, 301 (2d Dept. 1986) ([A] private person directly involved in the care of a state's client is . . . essentially a contract service provider.").  The Cowards were contractors, or family care providers, for the OMRDD.  Similar to Umbehr, Plaintiffs allege that the government terminated their operating license in retaliation for their speech criticizing the defendants.  Id. at 671.

In its recent decision in Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), the Supreme Court provided a two-step analysis to determine the constitutional protection given to speech of a public employee or independent contractor.  Id.  A court must first determine whether the employee spoke as a citizen on a matter of public concern or if the employee spoke pursuant to his official duties.  Id.  If he spoke pursuant to his official duties, then the employee has no First Amendment cause of action.  If he spoke as a citizen on a matter of public concern, then the possibility of a First Amendment claim arises.  Id. at 1958; Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2006).  The court must then determine if the speech is protected.  Skehan, 465 F.3d at 106.

If Plaintiffs' speech had been part of their official duties, the First Amendment would not extend to protect it. Garcetti, 126 S.Ct. at 1960; Skehan, 436 F.3d at 105. The Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id.; see also Healy v. City of N.Y. Dep't of Sanitation, 2006 WL 3457702, 04-CV-7344, *5 (S.D.N.Y. Nov. 22, 2006) (granting summary judgment because plaintiff's own complaint alleged speech made "[a]s part of his duties). In their Second Amended Complaint, the Cowards suggest that 14 N.Y.C.R.R. § 87.8 mandated their speech as part of their official duties as home care providers. See Second Amend. Compl. ¶ 84-85; see also Pl. Mot. Of Law, at p. 26 ("...in obtaining an operating certificate, the Cowards assumed an obligation to foster PV's health, comfort, care and attention as part of their duties under the law."). Indeed, under New York State regulations, the Cowards had certain obligations towards their consumers including the provision of "adequate and humane care for all clients residing in the family care home." 14 N.Y.C.R.R. § 687.8(f). Similarly, the Cowards were required to "contribute toward the development and implementation of the client's total plan of care," id. at 687.8(j); see also 14 N.Y.C.R.R. § 87.8(B) ("The family care provider shall participate . . . in planning treatment for each resident."). This included providing "for the medical and health needs of the residents" by, among other things, "arranging for routine and emergency medical . . . care." 14 N.Y.C.R.R. § 87.8(d)(3). Plaintiffs' speech concerning the most appropriate medical care for one of its consumers was in connection with their obligation to provide care to their consumers. Accordingly, they were speaking as part of their official duties and their speech is not protected. See Williams v. Dallas Ind. Sch. Dist., 480 F.3d 689 (5th Cir. 2007).

Assuming, *arguendo*, Plaintiffs were speaking as private citizens, Plaintiffs still must establish a First Amendment violation to succeed on a § 1983 retaliation claim. To establish a First Amendment violation in a 42 U.S.C. § 1983 claim, Plaintiffs must prove "that [they] engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant[s]." Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d. Cir. 2006) (discussing requirements of First Amendment retaliation claim involving the revocation of a nursing home's operating certificate) (citing Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998)); see also Skehan, 465 F.3d at 106 (2006) ("[T]o establish a First Amendment retaliation claim, plaintiffs must prove that: (1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a "motivating factor" in the adverse employment decision.")

The Cowards assert that their speech concerning PV's medical treatment is protected because it addressed a matter of public concern. Under the First Amendment, speech that constitutes a matter of public concern is speech that relates to "'any matter of political, social, or other concern to the community.'" Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). The determination of whether speech relates to a matter of public concern is a question of law for the court, and must be "determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. at 148; Gronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005). To make this determination, the court should focus on the motive of the speaker. Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999).

The Cowards assert that their speech is protected public speech because it centered around the care and promotion of the health of mentally disabled adults. Pl. Mem. Opp. Summary Judg. at 25-26 (citing N.Y. CONST., art. XVII, §3; NY MEN. HYG. LAW § 31.03(b)(1) and (2); DiMarco v. Rome Hosp. & Murphy Mem. Hosp., 1991 U.S. Dist. LEXIS 16603 at *22 (NDNY 1991)). Specifically, the Cowards assert "complaints about patient care . . . would be a matter of public concern such that they would be constitutionally protected by the first amendment." Id. at 26 (quoting DiMarco, 1991 U.S. Dist. LEXIS 16603 at *22). However, Plaintiff's reliance on Dimarco is misplaced. In DiMarco, the plaintiff, a doctor, had shared numerous concerns with the New York State Department of Health regarding the conduct and medical judgment of his colleagues and the nursing staff and the overall practices and management of the defendant hospital. DiMarco, 1991 WL 336000, *1-2 (N.D.N.Y 1991). The speech in that case was wide-reaching and dealt with his patients' well-being, the general workings of the hospital, and the community's interest in quality care. The court also judged the speech not to be based on the plaintiff's own personal concerns, but that of his patients and the community. Id. at *8; see also Paradis v. Montrose Memorial Hosp., 157 F.3d 815, 818 (10th Cir. 1998) (nurse's complaints that doctor only treated patients based on their ability to pay and practicing without a license constituted public speech); Arnold v. Oklahoma County Bd. Of County Comm'rs, 77 F.3d 492, 1996 WL 84125, *4 (10th Cir. 1996) (unpublished) (pharmacist's statement regarding filling of prescription was protected speech because it indicated improper medical treatment); Springer v. Henry, 2004 WL 2127172, *11 (D. Del. 2004) (public health care provider's speech on a psychiatric center's dangerous conditions and practices that could lead to suicides and escapes constituted protected public speech addressing an issue of concern for the community).

The instant situation is readily distinguished from DiMarco, Paradis, Springer, and Arnold considering the content, form, and context of the speech. The Cowards' speech is not constitutionally protected because it does not address an issue of general concern for the public at large. Rather, the speech concerned only whether PV should have a lumpectomy or mastectomy, an isolated, private matter not a public concern. The speech was made during ongoing discussions with PV's doctor over what course of treatment should be pursued for PV's cancer. It occurred only in the doctor's office and in conversations with PV's caseworker, nurse, and father. See Connick, 461 U.S. at 147-48; Dudzik v. City of New York, 2003 WL 203226, *7 (S.D.N.Y. 2003) (noting that plaintiff's choice of forum is a relevant contextual factor; but see Ezekwo v. N.Y. City of Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991) (stating that a private forum choice rather than a public forum choice rather than a public forum does not alter the first amendment analysis) (citing Givhan v. Western Consolidated School Dist., 439 U.S. 410, 414 (1979)).

"[T]he mere fact that one or two comments could be construed broadly to implicate matters of public concern does not alter the general nature of [the] statements." Ezekwo, 940 F.2d at 781. Like the speech made in Ezekwo, the Cowards' statements made were specific and personal in nature and related to their own beliefs and the situation of one of their consumers. Id., at 781 (holding that memorandums written by a Medical Resident describing lack of proper supervision, poor management, and failure of physicians to arrive at lectures on time were private complaints not matters of public concern). Unlike the speech in Beechwood, where the nursing home operator continually wrote long public letters advocating changes to Department of Health policy, the Cowards only spoke on one specific private matter. Beechwood, 436 F.3d at 150, 152 (holding speech protected by First

Amendment because of its public nature).  There is no evidence here of formal complaints or complaints concerning systemic concerns thereby bringing their speech into the realm of public concern.

      The Cowards' speech and its purpose resemble the speech described in McGuire v. Warren, 404 F. Supp.2d 530 (S.D.N.Y.), aff'd in part, vacated in part, rev'd in part, 207 Fed. Appx 34, 2006 WL 3456538 (2d Cir. 2006) (upholding district court's finding that speech did not constitute public speech and reversing on other grounds).  In McGuire, a special education teacher contended that letters to parents of a child concerning the child's progression in school were matters of public concern because the care and education of special education children is a matter of public concern.  Id. at 537.  The court held that this was a matter of private interest not public interest.  Id.  The Cowards' interest in the treatment of PV is similar to that of a special education teacher in her students' well-being. Under the facts and circumstances of this case, this interest does not rise to the level of public interest.  Indeed in McGuire, the court stated that advocacy for services and rights of one's charges "may be an important issue, however it 'do[es] not necessarily become a matter of public concern simply because in different circumstances the opinions might become the topic of general interest to the public.'"  Id. (quoting Flynn v. N.Y. City Bd. Of Educ., No. 00-civ-3775, 2002 WL 31175229, at *7 (S.D.N.Y. Sept. 30, 2002)).  For the foregoing reasons, the Court finds that the plaintiffs did not engage in protected speech.

**IV.    CONCLUSION**

For the foregoing reasons, the Court finds that Plaintiffs were speaking pursuant to their official duties or, alternatively, that they were not speaking on matters of public concern and Defendants' motion for summary judgment is, therefore, GRANTED and the Complaint DISMISSED.  The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

Dated:   April 24, 2007

*Thomas J. McAvoy*
Thomas J. McAvoy
Senior, U.S. District Judge